Troutman Pepper Hamilton Sanders LLP
301 Carnegie Center, Suite 400
Princeton, NJ 08540



www.troutman.com

Angelo A. Stio III
Partner
D: 609.951.4125
angelo.stio@troutman.com
Admitted in: New Jersey, New York, Pennsylvania

August 26, 2024

**VIA FEDEX**

Honorable Harvey Bartle III, U.S.D.J.
United States District Court for the
   Eastern District of Pennsylvania
16614 U.S. Courthouse
601 Market Street
Philadelphia, Pennsylvania 19106

**Re:**    **DANIEL'S LAW CASES – DISCOVERY DEFICIENCIES**

Dear Judge Bartle:

We write to bring to the Court's attention the ongoing non-compliance of Plaintiff Atlas Data Privacy Corporation ("Atlas") with the Court's June 3, 2024 and July 24, 2024 Orders. Pursuant to Local Civil Rule 37.1(a)(1), we now respectfully request a telephone conference concerning this discovery dispute.

Specifically, Atlas's non-compliance involves two issues related to the Consolidated Remand Motion:

    1.   Atlas's failure to produce (a) the clickwrap records showing when the Service Terms containing the assignments at issue in the remand motion were accepted by the Assignors, and (b) the vendor agreement for the clickwrap technology showing when this clickwrap technology was employed; and

    2.   Atlas's failure to produce a privilege log, or an acknowledgement that no documents they were ordered to produce pursuant to the June 3, 2024 Order are being withheld as privileged. (*Carco*, 1:24-cv-4077-HB, ECF No. 42).

As required by Local Civil Rule 37.1(a)(1), the Remand Defendants sought to obtain this information informally by way of letter dated August 12, 2024 and a follow-up email on August 20, 2024, (see Ex. A and B) but have not received any response from Atlas outlining its position.

Troutman Pepper Hamilton Sanders LLP, a Georgia limited liability partnership
Delia C. Donahue, Partner-in-Charge, Princeton Office



### 1. The Clickwrap Records and Vendor Agreement

During the deposition of Atlas's Rule 30(b)(6) representative, Matthew Adkisson testified about clickwrap technology used by Atlas that allegedly memorializes each Covered Person's acceptance of Atlas's Service Terms. Ex. C, Dep. Tr. 99:6-25, 100:1-25, 101-1-16, 120:6-9, 122:22-25, 123:1-9. Mr. Adkisson testified that a "record" exists for each individual assignor in a "log file or similar manner" that is maintained by third-party vendor PactSafe, now known as Ironclad. *Id.* at Dep. Tr. 99:19-101:4. Mr. Adkisson also testified that Atlas has a contract with the third-party vendor. *Id.* at 123:6-9. Mr. Adkisson further testified that he believes Atlas has a right to these records (*id.* at dep. tr. 100:1-23, 223:18-25), yet no records have been produced.

It is the Remand Defendants' position that the production of the clickwrap records showing the alleged manifestation of assent to the Service Terms and the vendor agreement showing when the technology was deployed, should have been produced under paragraphs 1(a) and 1(b) of the Court's June 3, 2024 Order.[1] That information goes directly to the validity of the assignments in question, as it bears on whether Covered Persons assented to the Service Terms and any modifications thereto. If there are no valid assignments, Atlas's position in the Consolidated Remand Motion that it is a real party in interest because it possesses absolute and complete assignments is eliminated. Under New Jersey law, if there is not a manifestation of assent to the Service Terms by the assignors, then the terms would not be an enforceable contract. *See Wollen v. Gulf Stream Restoration & Cleaning, LLC*, 468 N.J. Super. 483, 502 (App. Div. 2021) (finding a hyperlink unenforceable because it was "vague, ambiguous and misleading" and there was no indication from the wording that the user was required to affirmatively assent, read, or acknowledge the terms and conditions). Likewise, the vendor agreement between Ironclad and Atlas is relevant because it will show when any technology was first deployed, and what versions, if any, of the Service Terms were assented to by the assignors.

---

[1] Plaintiffs, on or before June 24, 2024, shall produce the following non-privileged documents to Defendants in the above actions:

    (a)   All versions of the Atlas Daniel's Law Service Terms that were provided to the assignors from January 1, 2023 through the date of the last filed complaint and that include the provisions for all non-disclosure requests at issue in these actions and the assignment provision for all assignments at issue in the pending motions to remand.

    (b)   Agreements referenced in the above Atlas Daniel's Law Service Terms that apply to the assignors, including:

        i.   All versions of the Atlas Privacy Policy that were provided to assignors from January 1, 2023 through the date of the last filed complaint; and

        ii.   All versions of the Atlas Service Terms that were provided to the assignors from January 1, 2023 through the date of the last filed complaint.

June 3, 2024 Court Order, ECF No. 36.



Honorable Harvey Bartle III, U.S.D.J.
August 26, 2024
Page 3

**2. The Privilege Log or Acknowledgement that no documents were withheld.**

The Remand Defendants also believe they are entitled to either a privilege log or a written acknowledgement that no privileged documents were withheld from the production of subject matter jurisdictional discovery.[2]  Under the Court's June 20, 2024 Order, the privilege log was to be produced by July 31, 2024.  ECF No. 42. When a privilege log was not produced by July 31, we sent a letter to Atlas regarding this issue and follow up with email.  To date, neither a log nor written acknowledgement has been received.

\*\*\*

We thank the Court for its consideration of this request for a telephonic conference.  If the Court wishes to proceed in a different fashion, we will comply with any direction of the Court.

Respectfully,

Angelo A. Stio III

cc:  Rajiv Parikh, Esq.
      Adam Shaw, Esq.
      John Yanchunis, Esq.
      Ryan McGee, Esq.
      Mark C. Mao, Esq.
      James Lee, Esq.

---

[2] During Mr. Adkisson's deposition, the witness frequently invoked privilege when asked questions that were within the scope of the June 3, 2024 order, thus it would be surprising to now learn that Atlas did not withhold at least some privileged information from its production.  *See, e.g.,* Ex. C, Dep. Tr. 58:23-59:7, 93:21-94:3, 95:21-96:12, 108:3-22, 110:5-21, 111:22-112:1, 135:13-24, 137:9-17, 226:21-227:3, 238:16-20, 287:25-289:5.

# Exhibit A



Troutman Pepper Hamilton Sanders LLP
301 Carnegie Center, Suite 400
Princeton, NJ 08540

troutman.com

**Angelo A. Stio III**
D 609.951.4125
angelo.stio@troutman.com

August 12, 2024

**VIA EMAIL**

Mark Mao, Esq.
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, 41st Floor
San Francisco, CA 94104

James Lee, Esq.
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street, Suite 2800
Miami, FL  33131

Rajiv D. Parikh, Esq.
Kathleen Barnett Einhorn, Esq.
**PEM LAW LLP**
1 Boland Dr., Suite 101
West Orange, New Jersey 07052

John A. Yanchunis, Esq.
Ryan J. McGee, Esq.
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602

> **Re:**   *Atlas Data Privacy Corporation, et al. v. Carco Group, Inc., et al.*
> **Civil Action No. 1:24-cv-04077**

Dear Counsel:

We write to request documents identified during the Atlas Corporate Designee deposition on July 30, 2024 and to inquire about the production of a privilege log consistent with the Court's June 3, 2024 and June 20, 2024 Orders.

First, we request that Atlas produce the clickwrap "records" that purportedly show when individuals accepted the Service Terms containing the assignments, as well as the related clickwrap vendor contract. During the deposition, Atlas's corporate designee, Matthew Adkisson, testified about clickwrap technology as well as a related vendor contract, involving checking a box to memorialize the agreement by purported assignors to Atlas's Service Terms.  (Dep. T99:6-25, T100:1-25, T101:1-16, T120:6-9, T122:22-25, T123:1-9).  Mr. Adkisson testified that a "record" exists for each individual in a "log file or similar manner" that is maintained by a vendor PactSafe, which is now known as Ironclad.  (Dep. T99:19

August 12, 2024
Page 2



to 101:4).  Mr. Adkisson testified further that he believes Atlas has a right to the records, (Dep. T100:1 to 23; T223:18 to 25), yet these records were not produced.

These records and the vendor contract should have been produced.  These records are relevant to the subject matter jurisdiction issue because they relate to the whether the Service Terms and Assignments are valid and to the identification of the real parties in interest in this case.  More importantly, these documents are part of the Service Terms themselves, which Atlas was explicitly directed by the Court to produce in paragraph 1(a) and (b) of the June 3, 2024 Order.

In light of the foregoing, we request that Atlas produce the clickwrap records for all purported assignors and the related vendor contract, no later than August 16, 2024.  If Atlas fails to produce the records by this date, we will bring this issue to the Court's attention and ask that it be addressed before Defendants' deadline to file a Consolidated Opposition brief.

In addition, we have neither received a privilege log from Atlas with regard to the production of documents nor an acknowledgement that no privileged documents exist.  This privilege log was due on July 31, 2024 under the July 20, 2024 Order.  Please provide us with a privilege log or an acknowledgement by August 16, 2024 as well.

We note that there were numerous other problems with the deposition.  We reserve all rights as to those.

Very truly yours,


*/s/ Angelo A. Stio, III*

Angelo A. Stio, III

# Exhibit B

**Lloyd, Susie J.**

---

| | |
|---|---|
| **From:** | Stio, III, Angelo A. <Angelo.Stio@Troutman.com> |
| **Sent:** | Tuesday, August 20, 2024 2:56 PM |
| **To:** | Rajiv D. Parikh, Esq.; Lloyd, Susie J.; Kathleen Barnett Einhorn; mmao@BSFLLP.com; jlee@bsfllp.com; JYanchunis@forthepeople.com |
| **Cc:** | Raether, Ronald I.; Jessica  A. Merejo, Esq.; Ryan McGee x3030 |
| **Subject:** | RE: Atlas Data Privacy, et al v. Carco, et al - 8/7/2024 Letter from Defendants |

Raj, I hope you had a nice weekend.  I am following up on my August 12 letter concerning the clickwrap documents and privilege log.

Can you please get back to me today on Plaintiffs' position?

Thanks.

**Angelo A. Stio III**
**Partner**
**troutman** **pepper**
Direct: 609.951.4125 | Mobile: 609.610.2279
angelo.stio@troutman.com

---

**From:** Rajiv D. Parikh, Esq. <rparikh@pemlawfirm.com>
**Sent:** Friday, August 16, 2024 12:13 PM
**To:** Lloyd, Susie J. <Susie.Lloyd@troutman.com>; Kathleen Barnett Einhorn <keinhorn@pemlawfirm.com>; mmao@bsfllp.com; jlee@bsfllp.com; jyanchunis@forthepeople.com
**Cc:** Stio, III, Angelo A. <Angelo.Stio@Troutman.com>; Stio, III, Angelo A. <Angelo.Stio@Troutman.com>; Raether, Ronald I. <Ron.Raether@troutman.com>; Jessica A. Merejo, Esq. <jmerejo@pemlawfirm.com>; Ryan McGee x3030 <rmcgee@forthepeople.com>
**Subject:** RE: Atlas Data Privacy, et al v. Carco, et al - 8/7/2024 Letter from Defendants

> CAUTION: This message came from outside the firm. DO NOT click links or open attachments unless you recognize this sender (look at the actual email address) and confirm the content is safe.

Angelo – we are reviewing this and will revert back next week with our thoughts.

Thanks,

Raj

---

**From:** Lloyd, Susie J. <Susie.Lloyd@troutman.com>
**Sent:** Wednesday, August 7, 2024 3:20 PM

**To:** Rajiv D. Parikh, Esq. <rparikh@pemlawfirm.com>; Kathleen Barnett Einhorn <keinhorn@pemlawfirm.com>; mmao@bsfllp.com; jlee@bsfllp.com; jyanchunis@forthepeople.com
**Cc:** Stio, III, Angelo A. <Angelo.Stio@Troutman.com>; Stio, III, Angelo A. <Angelo.Stio@Troutman.com>; Raether, Ronald I. <Ron.Raether@troutman.com>
**Subject:** Atlas Data Privacy, et al v. Carco, et al - 8/7/2024 Letter from Defendants

Counsel,

Please find attached a letter from Attorney Angelo Stio.

Thank you,

**Susie Lloyd**
Attorney
Cell: 724.561.7546
susie.lloyd@troutman.com
_____

**troutman** **pepper**
301 S College Street, Suite 3400
Charlotte, NC 28202
troutman.com

Troutman Pepper is a Mansfield Certified Plus Firm

This e-mail (and any attachments) from a law firm may contain legally privileged and confidential information solely for the intended recipient. If you received this message in error, please notify the sender and delete it. Any unauthorized reading, distribution, copying, or other use of this e-mail (and attachments) is strictly prohibited. We have taken precautions to minimize the risk of transmitting computer viruses, but you should scan attachments for viruses and other malicious threats; we are not liable for any loss or damage caused by viruses.

# Exhibit C

1                 IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF NEW JERSEY

3

4
      In re:                         )
5                                    )
      DANIEL'S LAW COMPLIANCE        )
6     LITIGATION                     )
                                     )
7     ----------------------------)

8

9

10

11                     * CONFIDENTIAL *

12

13

14      VIDEOTAPED DEPOSITION OF MATTHEW WILLIAM ADKISSON

15         ATLAS DATA PRIVACY CORPORATION 30(b)(6)

16                    New York, New York

17                 Tuesday, July 30, 2024

18

19

20

21

22

23    Reported by:

24    KRISTIN KOCH, RPR, RMR, CRR

25    JOB NO. J11491590



```
 1        Q.    So there were no communications with
 2   any of the individuals who were assignors about a
 3   court where an action can be brought, is that your
 4   testimony?
 5        A.    So if you are asking if there was
 6   any -- you are asking if there was any
 7   conversation with any individual who ended up
 8   being an assignor about any court where an action
 9   might be brought?
10        Q.    Uh-huh.
11        A.    In general terms, there may have been
12   discussion about the fact that Daniel's Law
13   allowed for an individual or their assignee to go
14   to court to seek relief, but there was no
15   discussion of what specific court that might be or
16   where that might take place.
17        Q.    How do you know that there were those
18   discussions?
19             MR. LEE:  Objection.  Vague as to
20        discussions.
21        A.    Again, in broad terms if -- if you are
22   asking if there was ever any discussion about
23   going to court to seek relief for violations of
24   Daniel's Law, that would have been -- that would
25   have been part of a discussion of understanding
```



```
 1   one more time.  I want to make sure I understand
 2   the components of it.
 3                MR. STIO:  Can you read it back.
 4                MR. LEE:  And then let me make my
 5        objection.
 6                (Record read.)
 7                MR. LEE:  So let me make my objection.
 8        This is asked and answered three times now.
 9        This is well beyond the scope of the topics
10        outlined by the court, and the suggestion
11        that this witness ought to be prepared on
12        this question is absurd.  In fact, the court
13        already ruled that engagements with the firm
14        are off limits, which is why those
15        engagements weren't produced, so I think you
16        should stand on your answer and we should
17        move on.
18                MR. STIO:  You can answer it.
19                MR. LEE:  Asked and answered.
20        A.    I don't know that I can provide more of
21   an answer than I already have.
22                MR. STIO:  Can I get this marked.
23                (Atlas Exhibit 4, Atlas' Daniel's
24        Law Service Terms, Bates stamped
25        ATLAS-REMAND_00000001 through
```



 1        ATLAS-REMAND_00000014, marked for

 2        identification.)

 3        Q.    Mr. Adkisson, I am going to show you

 4   what's been marked as Atlas 4.  Do you see this,

 5   sir?

 6        A.    I do.

 7        Q.    It has a Bates label

 8   ATLAS-REMAND_00000001 through 014.  Do you see

 9   that, sir?

10        A.    I see the first page with a 1 and I see

11   the last page with a 14, yes.

12        Q.    Okay.  Do you know what this is?

13        A.    Based on the header on the first page,

14   it looks to be the Atlas Daniel's Law service

15   terms dated February 4th, 2024.

16        Q.    Do you have any reason to believe that

17   these are not Atlas' service terms?

18        A.    It's hard to answer that without

19   reading through the document, but I take you at

20   your word that you have handed me the correct

21   document.

22        Q.    Do you know how these service terms are

23   accepted by a user of Atlas' platform?

24        A.    I do.

25        Q.    How?



 1      A.    During the sign-up process when a user

 2   is creating an Atlas account, at a certain step in

 3   the process they would be presented with service

 4   terms and they would be asked to read and affirm

 5   their acceptance.

 6      Q.    How do they affirm their acceptance?

 7      A.    They use what I believe is commonly

 8   known as a clickwrap technology in the legal

 9   industry.  They -- clickwrap technology.

10      Q.    Walk me through what is a clickwrap

11   technology, how does it work?

12      A.    I'm not an expert at clickwrap

13   technology, but I believe it involves checking a

14   box and affirming that the individual has agreed

15   to the terms and then memorializing that

16   agreement.

17      Q.    And what document do you have that

18   memorializes that agreement of a checkbox?

19      A.    We use a third-party service provider

20   for this clickwrap technology.  My understanding

21   is every time the terms of service in this type of

22   instance is agreed to, they create a third-party

23   record of that terms of service having been agreed

24   to and they record some information about the

25   person agreeing to it.



 1        Q.    Did you seek to obtain this third-party
 2   record for production in this case?
 3              MR. LEE:  Objection.
 4        A.    I'm sorry.  What do you mean?
 5        Q.    Did you get a copy of this third-party
 6   record for production in this case?
 7              MR. LEE:  Are you suggesting it was
 8        supposed to be produced in this case pursuant
 9        to a court order, sir?
10              MR. STIO:  You can answer.
11        A.    Well, when you say "record," I'm not
12   sure exactly what you are referring to.  Do you
13   mean every instance --
14        Q.    You used the term "third-party record,"
15   so it's your terminology.  Do you have a copy of a
16   third-party record that shows acceptance of the
17   clickwrap?
18        A.    My understanding is that the service
19   provider keeps that record in their systems in a
20   log file or similar manner.
21        Q.    Do you have access to that?
22        A.    I imagine we do, but I haven't accessed
23   it myself.
24        Q.    Okay.  Who is the service provider?
25        A.    I believe when we signed on with them



1  they were called PactSafe.  I think they either

2  were acquired or -- prior to us signing on or were

3  acquired afterwards, and now they roll up to what

4  I believe is Ironclad, a legal services company.

5      Q.    And with this clickwrap technology,

6  when does that come up in the process of

7  registering for your services?

8      A.    Let's see.  If I walk through the

9  sign-up flow, first we would, as I recall, solicit

10  and gather biographical information about the

11  user, things that you need in order to create an

12  account for someone:  First name, last name,

13  e-mail address, things like that.  After a certain

14  amount of information has been gathered, then they

15  are presented with the terms of service governing

16  the relationship between us and them.

17      Q.    Can we go to 006 on Atlas 4.

18      A.    Okay.  I'm on 6.

19      Q.    Okay.  At the bottom of 006 there is a

20  section entitled Revenue Share on Recoveries Under

21  Assignment Confirmations.  Do you see that, sir?

22      A.    You are talking about the last

23  paragraph?

24      Q.    Correct.

25      A.    I see this, yes.



1  incorporation of probably twenty companies in

2  Delaware.

3      Q.    Who made the determination of the

4  65 percent/35 percent net split outlined in

5  Atlas 4 under revenue share or recoveries under

6  the assignment confirmations?

7          MR. LEE:  That's privileged.

8      A.    I think that would get into what we

9  talked about before, which is discussions with

10  counsel.

11          MR. STIO:  Okay.  Are you instructing

12      him not to answer the question who made the

13      determination of the split?

14          MR. LEE:  I am telling him not to

15      answer to the extent that it waives

16      privilege.  He just answered that question.

17          MR. STIO:  You can answer the question

18      then.

19          MR. LEE:  He just did it.

20      A.    It would take -- the answer to get into

21  any more specificity would take me into areas of

22  privilege.

23      Q.    In Atlas 4 the paragraph above Recovery

24  Share on Recoveries Under Assignment

25  Confirmations, it's entitled Assignments - Actions



1   assignee will have the exclusive right to bring

2   such civil enforcement, is that -- right here?

3   Okay.  Sorry.  Would you mind asking the question

4   again.

5           Q.    Yeah.  What is your understanding of

6   what -- or the origin of bringing a civil

7   enforcement action anywhere in the world, what

8   does that mean?

9           A.    You would have to ask the counsel who

10   drafted this.  I'm not sure.  I -- as a lay

11   person, I read anywhere in the world to mean

12   anywhere on planet earth.

13          Q.    Who is the counsel that drafted Atlas

14   4?

15          A.    There were different outside counsel

16   that worked on it over time, some of the folks I

17   have mentioned already.

18          Q.    Does this include Boies Schiller?

19          A.    I think the -- the counsel we worked

20   with this on would be part of that privilege area

21   that I don't feel comfortable getting into.

22          Q.    I am not asking you for any of the

23   communications.  I am just asking you who you

24   worked with as counsel.  Was it Boies Schiller?

25          A.    It's possible that any of the outside



1  counsel that we engaged may have provided feedback

2  on any documents of this type.  More than that I

3  cannot say.

4       Q.   Was Boies Schiller involved in

5  providing feedback on Atlas 4?

6       A.   Again, I'm gonna just be -- I'm gonna

7  say what I said before, which is I'm not

8  comfortable getting into that, into those

9  discussions with our counsel.

10           MR. STIO:  Are you instructing him not

11      to answer?

12           MR. LEE:  He is answering your

13      question.

14           MR. STIO:  He is not.

15      Q.   Mr. Adkisson, I am not asking you for

16  any type of legal communications you had.  Who,

17  what counsel, drafted Atlas 4?

18      A.   I feel like I've answered that question

19  to the best of my ability.

20      Q.   Okay.  Can you repeat the answer then,

21  because I don't recall you answering it.

22      A.   Any number of outside counsel could

23  have provided feedback on this document.  To go

24  into the specifics of who, what, why, where and

25  when, I think, would be getting into areas of



```
 1   privilege that I would be uncomfortable answering.
 2        Q.    I am not asking you what, why, where,
 3   when, I am asking you who, and you still haven't
 4   answered it.  What are the names of the firms that
 5   drafted Atlas 4?
 6             MR. LEE:  You can answer that specific
 7        question if you recall.  Just that narrow
 8        question.
 9        A.    I don't recall.
10        Q.    Are you aware of any named plaintiff in
11   any of the cases that are the subject of today's
12   deposition that has a counsel that's different
13   than the counsel representing Atlas?
14        A.    Sorry.  Would you repeat that one more
15   time.
16        Q.    Sure.  Is there any attorney of a named
17   plaintiff in the cases captioned in the Order as
18   Atlas 2 that is being represented by a counsel
19   different than a counsel that's representing
20   Atlas?
21        A.    What do you mean by "represented by"?
22        Q.    Have they engaged a lawyer to represent
23   them in the litigation other than Boies Schiller,
24   Morgan & Morgan or Genova Burns or PEM Law, that
25   you are aware of?
```



1    Q.    Where are they available, sir?

2    A.    During the sign-up process individuals

3  have the option to download a copy of the terms of

4  service and we know that individuals have done

5  this.

6    Q.    How do you know that?

7    A.    I think we record the -- or either we

8  or the clickwrap provider would record when that

9  action is taken.

10   Q.    I want to go to the section on Atlas 4

11  under assignment confirmations.

12   A.    Do you have a page number?

13   Q.    I will get you that, sir.  000006.

14   A.    Okay.  I'm on page 6.

15   Q.    Can you walk me through the process of

16  how the assignment confirmation is issued and then

17  accepted by the assignors?

18   A.    Upon signing up with Atlas and being

19  presented with this terms of service, a user would

20  presumably I think in the cases you are asking

21  about have accepted this terms of service.  This

22  terms of service makes a provision for Atlas to

23  send that individual an assignment confirmation,

24  which causes their claim to be assigned to Atlas

25  or a designated affiliate.  Sometime after



 1   with the updated terms of service and it would

 2   have a clickwrap included as part of that process.

 3        Q.    If there is a change to the terms of

 4   service, is there any notice given to the

 5   assignors?

 6        A.    So you are asking if there is a change

 7   to the terms of service, is there any notice that

 8   we provide to assignors, meaning covered persons

 9   whose claims have been assigned?

10        Q.    Or just any -- let's make it even

11   easier.  A user of the Daniel's Law services, if

12   there is a change in the terms of service, is

13   there a notice that goes out that there is a

14   change?

15        A.    We would post the updated terms of

16   service in all the relevant areas where it would

17   need to be included in our platform.

18        Q.    Other than that, is there any type of

19   notice?

20        A.    Not -- not a universal notice, which I

21   think is what you are asking about, no.

22        Q.    And in terms of the clickwrap

23   technology that you use for acceptance of the

24   terms of service, has that clickwrap been in

25   effect since Atlas was created or incorporated?



```
 1        A.    No.

 2        Q.    When did it go into effect?

 3        A.    I don't remember the specific date.  My

 4   best recollection is sometime in late 2022 or

 5   maybe very early 2023.

 6        Q.    Is there a document or record that

 7   would tell you when that went into effect?

 8        A.    We have a contract with the vendor.

 9   I'm sure there is a date on that contract.

10             (Atlas Exhibit 6, Atlas Privacy Order

11        Form, Bates stamped ATLAS-REMAND_00000369

12        through ATLAS-REMAND_00000373, marked for

13        identification.)

14        Q.    I want to show you what's been marked

15   as Atlas 6.

16        A.    I see Atlas 6 here.

17        Q.    Okay.  It is a document with Bates

18   label ATLAS-REMAND 0000369 through 373.  Do you

19   see that, sir?

20        A.    I see the first page I have is 369 and

21   the last page I have is 373.

22        Q.    Okay.  On the first page, who signed

23   for Crowd -- CrowdShield Corporation?

24        A.    I did.

25        Q.    Okay.  And what is the address that is
```



```
 1        A.    I was.

 2        Q.    Was Atlas represented by counsel with

 3   regard to the negotiation of Atlas 7?

 4        A.    What do you mean by "represented by

 5   counsel"?

 6        Q.    Did you have counsel representing you

 7   in negotiations and edits to Atlas 7?

 8        A.    We did.

 9        Q.    Who was that counsel?

10        A.    I'll give you the same answer I gave

11   you before.  A mix of firms that would have been

12   retained by us as outside counsel at the time.

13        Q.    But you don't know who specifically; is

14   that correct?

15        A.    This, I think, gets into that

16   privileged area, so whether I know or not I will

17   just state my -- restate my concern that this

18   violates some of those sensitive privilege areas,

19   and, again, my understanding was the scope of the

20   deposition today was to be focused on subject

21   matter jurisdiction and CAFA, I guess that's the

22   Class Action Fairness Act, so some of these -- I'm

23   happy to be helpful where I can.  Some of these

24   questions seem farther afield.

25             MR. STIO:  Are you asserting privilege
```



```
 1              MR. LEE:  It's the second time you
 2         asked me that question.  I directed him to
 3         answer.  He answered your question.  The
 4         record will reflect that.  Then you continued
 5         to ask him the same question.
 6              MR. STIO:  He didn't answer.
 7              MR. LEE:  And round and round we go.
 8         So why don't you move on.
 9         Q.    What firms spoke to the State Trooper
10    Fraternal Association on behalf of Atlas with
11    regard to Atlas 7?
12         A.    Again, to the extent that any firms --
13    I'm just not comfortable with that area of
14    questioning, because it seems to get into trying
15    to understand our communications with our counsel,
16    which I am led to be believed is privileged and my
17    understanding is that that's privileged, so --
18              MR. LEE:  I might try to bypass this
19         for a second.  Angelo, just bear with me for
20         one second.
21              His question is a little different,
22         this question.  He is -- if I am
23         understanding counsel correctly, he is asking
24         if you are aware of any communications by
25         your outside counsel with the State Troopers
```



1    Q.    And then in filing a lawsuit, Atlas

2  chose to consolidate or aggregate all of those

3  individual assignment confirmations against one

4  company in one lawsuit; correct?

5         MR. LEE:  Asked and answered.

6    A.    Again, I not being a lawyer don't know

7  what you may mean using the words "consolidate" or

8  "aggregate."  Beyond that I feel like I have

9  answered this question half a dozen times.

10    Q.    Answer it for me, please.

11    A.    I did answer it in the first part of my

12  response to you.  I'd say I'm not a lawyer and I'm

13  not sure what you might mean by consolidate or

14  aggregate, if those have a specific legal meaning

15  that I might not be aware of, but...

16    Q.    Put together.  I am not trying to put a

17  legal meaning on it.  Atlas chose to put those

18  claims together into one lawsuit?

19    A.    Do you mind re-asking the question with

20  put together in place of consolidate or aggregate.

21    Q.    Sure.  Atlas chose to put together all

22  of the individual claims it had for up to 19,000

23  people against one company into one lawsuit?

24    A.    So you are asking if Atlas chose to

25  take a certain action.  I think the -- the



```
 1   material around that would fall into discussions

 2   with outside counsel and would be part of

 3   litigation strategy and subject to privilege.

 4        Q.   Well, okay, but Atlas has these

 5   assignment confirmations; correct?

 6        A.   Atlas sent assignment confirmations and

 7   effectuated the assignment of claims to itself.

 8        Q.   So Atlas is saying it has these

 9   assignments of claims; correct?

10        A.   I feel like I answered that question

11   already.

12        Q.   So go ahead and answer it.

13        A.   Atlas sent out assignment confirmations

14   causing claims to be assigned to itself, to Atlas.

15        Q.   Okay.  So Atlas has these assigned

16   claims?

17        A.   I don't know how many times you are

18   going to ask that same question.

19        Q.   Yes or no?

20        A.   I am answering it in the way that I am

21   comfortable answering it, so I'm not sure I can --

22        Q.   You can't answer that question yes or

23   no?

24             MR. LEE:  He can answer however way he

25        wants.  He has already answered that
```



```
 1        question --

 2               MR. COLLINS:  Fair enough.

 3               MR. LEE:  -- several times.

 4        Q.    You cannot answer that question yes or

 5   no?

 6        A.    I feel like I have answered the

 7   question.

 8        Q.    Okay.  How did you go about deciding to

 9   put those claims together against Oracle into one

10   lawsuit?

11               MR. LEE:  Objection.  Calls for

12         litigation strategy.  Asked and answered.

13        A.    I hear that as you asking essentially

14   the same question again.  Discussions of

15   litigation strategy we had with outside counsel

16   would fall into privilege.

17        Q.    So -- okay.  So Atlas' position is how

18   it decided to join the claims together in one

19   lawsuit is privileged?

20               MR. LEE:  Asked and answered.

21        A.    I don't know, I can give you the same

22   answer again if you'd like, but I don't feel like

23   you are asking a question that would elicit a

24   different response than the one I have already

25   given.
```



1          How many people were referred to the

2     three firms I mentioned a moment ago?

3          MR. LEE:  Outside the scope.

4     A.    I -- I'd be speculating if I gave you a

5     number.

6     Q.    How was it decided which of those

7     people would be individually named plaintiffs

8     versus would become assignors?

9          MR. LEE:  If you can answer without

10          revealing any privileged conversations, you

11          can.  If you cannot answer without revealing

12          privileged conversations, I direct you not to

13          answer.

14     A.    Sorry.  Would you mind repeating the

15     question.

16     Q.    How was it decided which of those

17     individuals would become individually named

18     plaintiffs versus assignors?

19     A.    That would go into discussions with

20     counsel that would fall under privilege.

21     Q.    All right.  Let's take that Oracle case

22     again, because I think it might be helpful to talk

23     about one case.

24          How -- how does Atlas keep the

25     assignors updated on the status of the litigation?



1        to answer based on privilege?

2                MR. LEE:  I'm directing him not to

3        answer based on privilege and the court's

4        prior order.

5        Q.    And are you following your counsel's

6   instruction?

7        A.    Yes.

8        Q.    What is your definition of privilege?

9        A.    You are asking me for my definition as

10   a lay person, obviously, of what privilege means

11   in a legal context?

12               MR. LEE:  Let me just make my outside

13        the scope deposition.

14        Q.    I am asking you as Atlas personified --

15               MR. LEE:  This is absolutely --

16               THE COURT REPORTER:  Hold on.  I can't

17        take two people at the same time.

18               MR. LEE:  Outside the scope.  Harassing

19        the witness.

20        Q.    I am asking you as Atlas personified

21   what your definition of privilege is.

22        A.    In the -- in the legal context?

23        Q.    As you have asserted it repeatedly in

24   this deposition.

25        A.    I'm not sure if I am asserting



1  privilege or not.  What I have done in this

2  deposition is sometimes in my answers articulate

3  that -- that the question goes to areas that I'm

4  uncomfortable answering because I believe they get

5  into areas that would be privileged.

6           Let me then answer the question about

7  what the -- what I would consider the definition

8  of privilege to be or what privilege means in a

9  legal context as it's been used today, let's say.

10 My understanding of privilege in this context,

11 legal context, is that it is one of the bedrocks

12 of the rule of law, that an individual retaining

13 legal counsel for any matter that they choose to

14 has the presumption that their conversations and

15 communications with that counsel will remain,

16 quote unquote, privileged, that they will be

17 outside the scope of things that could be used

18 against them, for instance, by the government in

19 an incident of criminal prosecution, and that

20 generally someone seeking legal services and

21 retaining -- or then -- and/or then retaining

22 legal services can feel that their consultations

23 and their communications with attorneys seeking

24 guidance will remain private and privileged, and

25 I'm sure there are some exceptions to that.



```
 1   Again, I'm -- I couldn't articulate what all of
 2   those exceptions are, but I know that there are
 3   some exceptions to that, and that's how I would
 4   define -- that's how I would answer the question
 5   you asked me, if I understood correctly.
 6        Q.   Have you ever registered any companies
 7   outside of Delaware?
 8        A.   If you are asking in the spirit of the
 9   earlier questions have I ever directly registered
10   or participated in the registering of -- I'm gonna
11   say incorporation of, I don't know if maybe when
12   you say "registration" that means the same thing,
13   have I ever participated in the registration or
14   incorporation of companies outside of Delaware,
15   the answer would be yes.
16        Q.   Where?
17        A.   I may not be able to recall every
18   state, but let me go through some of them that I
19   do recall.  Wyoming and Nevada.  Those are the two
20   that I can recall.
21        Q.   What companies did you incorporate in
22   Wyoming?
23        A.   I couldn't -- I couldn't give you a
24   list.  In cases where a -- an entity was needed to
25   hold a piece of real estate, for example, or to
```



1  hold -- or to simply be a passive disregarded

2  entity -- entity or holding company or something

3  like that, then Wyoming, I believe, is the

4  cheapest jurisdiction to incorporate in.  I think

5  it's only $50.  And that is much less than

6  Delaware.  I think Delaware -- I don't know for

7  sure, but I think it's a few hundred dollars.  So

8  in cases where, as I say, just a passive

9  disregarded entity -- entity was needed, then

10 Wyoming would be a jurisdiction attractive for

11 that purpose.

12      Q.   How many companies have you

13 incorporated in Wyoming?

14      A.   I couldn't tell you for sure, but

15 maybe -- less than a dozen, I'd say.

16      Q.   More than six?

17      A.   I'm not sure.  I'd be speculating.

18 Could be less than six, but I'd be shocked if it

19 was more than a dozen.

20      Q.   Do any of them have any relationship to

21 any of the Atlas entities?

22      A.   I don't believe so, no.

23      Q.   How many companies have you

24 incorporated in Nevada?

25      A.   Again, I'm speculating, but I would say

